**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>Human Dynamics Corporation and<br>Reorganized Human Dynamics<br>Corporation,<br><br>                    Debtors,<br>―――――――――――――――――<br>Reorganized Human Dynamics<br>Corporation,<br><br>                    Appellant,<br><br>v.<br><br>Human Dynamics Captive Management, et<br>al.,<br><br>                    Appellees.<br>―――――――――――――――――<br>Human Dynamics Captive Management, et<br>al.,<br><br>                    Appellants,<br><br>v.<br><br>Reorganized Human Dynamics<br>Corporation,<br><br>                    Appellant. | No. CV12-0509-PHX-DGC<br><br><br><br><br>No. CV11-2510-PHX-DGC<br><br>BK No. 2:05-10210 RTB<br>Adv. No. 2:07-ap-00690<br><br>**ORDER** |

These appeals arise from proceedings in the United States Bankruptcy Court for the District of Arizona.  On May 3, 2012, Human Dynamics Captive Management, G. Douglas Anderton, Kathy Anderton, Edward Kyle Anderton, Lori J. Anderton, and PC General Agency, Inc. (collectively "Defendants") appealed the bankruptcy court's findings.  No. CV11-2510, Doc. 9.  On the same day, Reorganized Human Dynamics Corporation ("RHDC") appealed an Extension Order and a Denial Order from the bankruptcy court.   No. CV12-0509, Doc. 7.   Both appeals have been fully briefed.[1] No. CV11-2510, Docs. 9, 14, 16; No. CV12-0509, Docs. 7, 9, 10.  For the reasons that follow, the Court will deny both appeals.[2]

## I.      Background.

In 1993, G. Douglas Anderton ("Doug Anderton") formed Human Dynamics Corporation ("HDC") to take advantage of business opportunities emerging in the professional employer organization industry.  In 2003, Doug Anderton and his son, G. Douglas Anderton, Jr., established Human Dynamics Captive Management ("HDCM"), opened a bank account in HDCM's name, and used that account to steal over 4.2 million dollars of HDC's money.  In 2005, Doug Anderton filed Chapter 11 bankruptcy for HDC. The reorganized company – Reorganized Human Dynamics ("RHDC") – commenced several lawsuits in 2007 to recover the money Doug Anderton stole from HDC. Following a four-day trial, the bankruptcy court entered judgment on November 18, 2011, holding Doug Anderton liable to RHDC for over 4.2 million dollars in fraudulent transfers, conversion, unjust enrichment, breach of fiduciary duty, breach of contract, and aiding and abetting.  CV11, Doc. 15-1, at 9-25.

---

[1] Documents filed under case numbers CV11-2510 and CV12-0509 are denoted as "CV11" and "CV12," respectively.

[2] The parties' requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

RHDC and Defendants have filed separate appeals. RHDC raises questions involving the timing of Defendants' appeal and the bankruptcy court's jurisdiction to extend the time for appeal, while Defendants raise arguments regarding the bankruptcy court's decision on the merits. The Court will address RHDC's appeal first.

**II.   Legal Standard.**

Under 28 U.S.C. § 158(a)(1), the Court has jurisdiction over appeals from "final judgments, orders, and decrees" of bankruptcy judges. Rule 8013 of the Federal Rules of Bankruptcy Procedure states:

> On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

The Court will review the bankruptcy court's conclusions of law *de novo*, but will not reverse the bankruptcy court's findings of fact unless they are clearly erroneous. *In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010). The Court must accept the bankruptcy court's findings of fact unless the Court "is left with the definite and firm conviction that a mistake has been committed[.]" *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009). Mixed questions of law and fact are reviewed *de novo*. *In re JTS Corp.*, 617 F.3d at 1109. The Court reviews the evidence on record in the light most favorable to the prevailing party. *Lozier v. Auto Owners Ins. Co.*, 951 F.2d 251, 253 (9th Cir. 1991); *In re Jake's Granite Supplies, L.L.C.*, 442 B.R. 694, 699 (D. Ariz. 2010).

**III.   RHDC's Appeal.**

Rule 8002(a) of the Federal Rules of Bankruptcy Procedure requires that a notice of appeal be filed within 14 days of the entry of judgment. Bankruptcy Judge Redfield T. Baum entered judgment against Defendants on November 18, 2011 (CV11, Doc. 15-1, at 9-11), and the deadline for filing a notice of appeal was therefore December 2, 2011.

Defendants filed their notice of appeal on December 9, 2011.  CV11, Doc. 15-1, at 6-7.
On December 20, 2011, counsel for RHDC informed counsel for Defendants that the
appeal was untimely pursuant to Rule 8002(a) and requested that Defendants dismiss the
appeal.  CV12, Doc. 8-1, at 63.

On the same day, Defendants filed a Motion to Extend Time to File Notice of
Appeal ("Motion to Extend").  CV12, Doc. 8-1, at 46-48.  In the Motion to Extend,
counsel for Defendants avowed that he calendared the filing of the Notice of Appeal for
December 2, 2011, but that "[b]ecause of an inadvertent typographical error in the
process of entering, the date was placed on the calendar for Friday, December 9, 2011,
the date the Notice of Appeal was filed."  CV12, Doc. 8-1, at 47.  Counsel for Defendants
claim that they became aware of the inadvertent error on December 20, 2011, the day
they filed the Motion to Extend.  *Id.*  Rule 8002(c)(2) provides that "a notice of appeal
must be made by written motion filed before the time for filing a notice of appeal has
expired, except that such a motion filed not later than 21 days after the expiration of the
time for filing a notice of appeal may be granted upon a showing of excusable neglect."
Fed. R. Bankr. P. 8002(c)(2).  Defendants argued that the bankruptcy court should
enlarge the time for their appeal pursuant to Rule 8002(c)(2) on grounds of "inadvertent
and excusable neglect."  CV12, Doc. 8-1, at 47.

On December 27, 2011, seven days after Defendants filed their Motion to Extend,
Judge Baum issued an order extending the time to file an appeal to December 26, 2011
("the Extension Order").[3]  CV12, Doc. 8-1, at 53-54.  RHDC notes that the Extension
Order did not reference the excusable neglect standard or any findings to support the
extension.  CV12, Doc. 7, at 9.

---

[3] The Local Rules of Bankruptcy Procedure allow the party responding to a
motion 14 days after service of the motion within which to serve and file a responsive
memorandum.  LRBankr 9013-1(c).  RHDC did not file a response to Defendants'
Motion to Extend before the bankruptcy court granted the extension, but RHDC had an
opportunity to present its position at the February 14, 2012 hearing on the Motion to
Extend.

On January 4, 2012, RHDC filed a Motion to Vacate.  CV12, Doc. 8-1, at 56-61. RHDC requested that the bankruptcy court vacate its Extension Order and deny Defendants' Motion to Extend.  On February 14, 2012, Judge Baum conducted a non-evidentiary hearing on the Motion to Extend.  CV12, Doc. 8-1, at 83.  He reasoned that there was no great prejudice in allowing the appeal given the minimal delay.  CV12, Doc. 8-1, at 97.  On February 28, 2012, Judge Baum issued an order ("the Denial Order") denying the Motion to Vacate and granting the Motion to Extend, thereby making Defendants' December 9 notice of appeal timely.  CV12, Doc. 8-1, at 103-104.

RHDC argues that the bankruptcy court committed at least three forms of reversible error when it entered the Extension Order and the Denial Order: (1) it erred as a matter of law when it ruled that Defendants' notice of appeal was both a nullity for jurisdictional purposes and yet a timely notice of appeal pursuant to Rule 8002 for purposes of perfecting Defendants' appeal; (2) it erred by entering the Extension Order and the Denial Order without considering any evidence; and (3) jurisdictional and evidentiary defects aside, simply "miscalendaring" a deadline is not excusable neglect sufficient to satisfy Rule 8002(c)(2).  CV12, Doc. 7, at 10.  RHDC asks the Court to reverse both the Extension Order and the Denial Order. *Id.*

The bankruptcy court did not create a jurisdictional paradox by extending the deadline for Defendants' notice of appeal and ruling that the notice was timely.  Until the extension was granted, there was no properly filed notice of appeal that divested the bankruptcy court of jurisdiction.  Ruling that the notice of appeal was timely did not retroactively divest the bankruptcy court of jurisdiction to grant the extension.

RHDC objects that the bankruptcy court never conducted an evidentiary hearing. CV12, Doc. 7, at 14-15; CV12, Doc. 10, at 9.  RHDC argues that the bankruptcy court improperly rested its ruling on the argument of Defendants' counsel which was not supported by an affidavit or declaration, witness testimony, documentary materials, or exhibits.  CV12, Doc. 10, at 9.  The Court disagrees.  Counsel for Defendants stated on the record at the bankruptcy court's February 14, 2012 hearing that "[t]his was frankly

[his] entering the date and hitting the wrong number," and not an instance of failure to comply with the rules. CV12, Doc. 8-1, at 93-94. The bankruptcy court did not err by relying on the avowal of Defendants' counsel that he simply miscalendared the date.

Finally, the Court must determine whether Defendants' miscalendaring constitutes excusable neglect. In *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, the Supreme Court addressed Federal Rule of Bankruptcy Procedure 9006(b)(1), which generally permits a bankruptcy court to enlarge a time period for action "on motion made after the expiration of the specified period . . . where the failure to act was the result of excusable neglect." The Supreme Court noted that Rule 9006(b)(1) was patterned after Federal Rule of Civil Procedure 6(b), and that "'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 391-92 (1993). *Pioneer* set forth factors relevant to excusable neglect determinations:

> Because Congress has provided no other guideposts for determining what sorts of neglect will be considered "excusable," . . . the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 395.

Here, Defendants filed their notice of appeal just one week after the original deadline had elapsed. CV11, Doc. 15-1, at 6-7. The Court does not find any prejudice to RHDC as a result of this delay. RHDC argues that Defendants should have voluntarily dismissed their appeal and re-filed once the bankruptcy court granted an extension, but RHDC could not have been prejudiced by Defendants' failure to follow this technical route. RHDC clearly was on notice that Defendants sought to appeal. Having considered

1   the circumstances of Defendants' delay in filing their notice of appeal, the Court

2   concludes that the delay resulted from excusable neglect.

3           The bankruptcy court did not commit reversible error by issuing the Extension

4   Order and the Denial Order.  The Court will deny RHDC's appeal.

5   **IV.    Defendants' Appeal.**

6           Defendants initially present the following issues on appeal: whether the

7   bankruptcy court committed clear error by finding that Defendants acted with actual

8   intent to defraud HDC and its creditors, that Defendants were immediate or mediate

9   transferees, that Defendants improperly took dominion and control over funds transferred

10  to HDCM, that Defendants were unjustly enriched, and that HDC was damaged, and by

11  denying Defendants' motion for reconsideration (CV11, Doc. 9, at 5), but Defendants

12  never directly address these issues in their briefing.  Rather, their opening brief consists

13  of nine pages of unstructured argument.  CV11, Doc. 9, at 11-19.  In its response, RHDC

14  distills five primary arguments from Defendants' appeal: (1) the money at issue belonged

15  to Infinet, the parent corporation, and not to HDC, its subsidiary; (2) the money

16  transferred from Lansdowne Insurance Company, LTD ("Lansdowne"), a rental captive

17  cell, to HDCM was properly used to pay workers' compensation claims, (3) Mr. Edward

18  Kyle Anderton ("Kyle Anderton") and PCGA, a related entity operated and owned by a

19  friend of Doug Anderton's, did not have dominion and control over the funds, (4) HDCM

20  was properly created for the purpose of distributing workers' compensation funds

21  released by Lansdowne, and the bankruptcy court should not disregard HDCM's

22  corporate form, and (5) Doug Anderton fulfilled his fiduciary duty to ensure

23  administration and payment of outstanding workers' compensation claims.  CV11,

24  Doc. 14, at 10-11; *see generally* CV11, Doc. 9, at 11-19.  Defendants adopt the

25  arguments identified by RHDC in their reply.  CV11, Doc. 16, at 10-12.  The Court will

26  as well.

27      **A.    Ownership of Funds.**

28          One of the main defenses presented before the bankruptcy court was the assertion

- 7 -

that the money at issue was not RHDC's. CV11, Doc. 15-1, at 14. Judge Baum found trial testimony that the funds belonged to another entity, Infinet, not credible because "virtually all of the documentary evidence establishes that the funds were solely the assets of HDC." *Id.* Judge Baum accordingly found that "[t]he funds held by Lansdowne were owned solely by HDC." *Id.* at 17, ¶ 12.

Defendants argue that the money transferred from Lansdowne to HDCM belonged to Infinet, not HDC. CV11, Doc. 9, at 10. Without citing to the record, they maintain that Infinet, as the parent holding company with designated subsidiaries for each state in which it provided services, consolidated all revenues generated by its subsidiaries into its corporate treasury. CV11, Doc. 16, at 10. The subsidiaries' cash flows were consolidated into Infinet, which administered and paid all claims, bills, premiums, and legal fees for its subsidiaries. CV11, Doc. 9, at 11. Defendants also claim that Infinet's officers and executives were the officers and executives of its subsidiaries. *Id.* They repeat these general claims throughout their briefing. *See* CV11, Doc. 9, at 12 ("These transfers involved money that belonged to Infinet and not RHDC. . . . All of RHDC's finances were consolidated into its parent Infinet which paid all of RHDC's obligations. There was no constructive fraud because the money belonged to Infinet and not to RHDC."); CV11, Doc. 16, at 10 ("It is uncontested that Infinet filed consolidated tax returns.").

RHDC does not dispute that Infinet was the parent corporation, but that does not mean that the money at issue belonged to Infinet. Both Doug Anderton and John Iorillo, Infinet's CFO from September 2001 to February 2003, testified at trial that all revenue was generated by Infinet's subsidiaries. Doc. 15-4, at 106-07 (Doug Anderson's testimony on redirect) ("Q: "[W]ith what money did Infinet pay those HDC Debtor company related bills? A: "All monies from all of the operating subsidiaries. . . . All those monies were swept together and put into Infinet and Infinet managed the affairs of all of its subsidiaries."); *id.* at 947-49 (Mr. Iorillo testifying on cross examination that Infinet obtained money from its operating subsidiaries by charging a management fee).

Defendants also argue that Human Dynamics Corporation Financial Services ("HDCFS"), an Infinet subsidiary in California, generated the vast majority of Infinet's revenue during the relevant time period in 2002.  Defendants allege that between July 9, 2002 and September 27, 2002, Infinet added 352 client companies in California to the 89 existing California companies.   CV11, Doc. 9, at 15.   As of September 27, 2002, Defendants claim that Infinet had only 129 Arizona-based clients.  *Id.* at 16.  Essentially, Defendants argue that it was impossible for HDC to generate the amount of revenue found by the bankruptcy court, and that the funds held by Lansdowne were primarily generated by HDCFS in California.  *Id.* at 16-17.

Judge Baum found that the undisputed evidence showed HDC earned significant revenue in California, and that withholding taxes were paid and reported on that revenue in California.  CV11, Doc. 15-1, at 14.  It was "very significant" to him that Infinet's and HDC's tax returns stated that such revenues were attributable to California purchasers but were sales made from outside California, which was "generally consistent with most of the evidence that HDC was the only operating company of [Infinet]."  *Id.*  Equally significant was that "those tax returns reported that revenue as earned by HDC and not any other entity.  Finally, HDC was virtually the only entity/wholly owned subsidiary of [Infinet] which produced any material revenue."  *Id.* at 14-15.  In his affidavit, Mr. Keith Bierman, a certified public accountant, opined based on his review of Infinet's tax returns that Infinet's total consolidated revenues of $216,134,893 for 2002 did not include any revenues from HDCFS.  Doc. 15-6, at 61.  Moreover, HDCFS did not appear as an entity in the consolidating schedule of Infinet's tax return.  *Id.*

Defendants object that the bankruptcy court incorrectly ignored the operating history and policies of Infinet and relied excessively on an incorrect tax return.  CV11, Doc. 16, at 11.  On the last day of trial, Defendants attempted to impeach their own federal tax returns by introducing Form 941 – Employer's Quarterly Federal Tax Return documents ("the 941 Forms") for HDC and HDCFS.  CV11, Doc. 15-5, at 11-19; *see* CV11, Doc. 14, at 9, n.4.  Defendants claim that the 941 Forms were submitted to

1    overcome errors in the unsigned 2002 tax return originally submitted to the bankruptcy
2    court.[4]  CV11, Doc. 9, at 16.  Judge Baum admitted the 941 Forms into evidence, but
3    found that they "[did] not prove that the monies at issue here were not earned and owned
4    by HDC."  CV11, Doc. 15-1, at 14.

5        The 941 Forms do not confirm the distribution of business between HDC and
6    HDCFS that Defendants allege.  *See* CV11, Doc. 16, at 11.  The 941 Forms for HDCFS
7    and HDC list the same address: 4711 E. Falcon Drive, Suite 251, Mesa, Arizona, 85215.
8    CV11, Doc. 15-5, at 11-19.  The total wages reported by HDCFS and HDC, respectively,
9    are $15,818,593 and $10,399,788 for the quarter ending March 2002, $19,236,279 and
10   $11,519,546 for the quarter ending July 2002, $53,021,362 and $11,897,621 for the
11   quarter ending September 2002, and $71,540,148 and $10,456,552 for the quarter ending
12   December 2002.  *Id.*  While HDCFS consistently reported a higher amount of total
13   wages, particularly in the last two quarters, these filings alone do not show that the
14   bankruptcy court committed clear error, especially in light of Doug Anderton's testimony
15   that "HDC generated more than 210 million dollars in revenue in 2002, which was a 25%
16   increase from the preceding year."  Doc. 15-1, at 33, ¶ 5.

17       Defendants also cite a September 27, 2002 interim agreement between HDC and
18   Seibels Bruce Group, Inc., and an October 1, 2003 loss portfolio transfer agreement
19   ("LPTA").  CV11, Doc. 16, at 11.  The interim agreement names HDC, Infinet, and
20   HDCFS as parties (CV11, Doc. 11, at 23), but the covenants contained therein involve
21   only HDC, not HDCFS.  CV11, Doc. 11, at 23-38.  Exhibit A to the interim agreement is
22   a letter to Seibels Bruce Group about the structure of "HDC's Workers' Compensation

---

[4] Defendants claim that "Infinet's 2002 consolidated tax return is inaccurate because it failed to list HDCFS.  Instead[,] the return repeated the corporate structure used in 2001, the year before the California subsidiary was created.  The error in the 2002 return is illustrated by the quarterly Federal 941 payroll tax forms filed by Infinet on behalf of its Arizona and California subsidiaries[.]"  Doc. 9, at 7.  RHDC responds that (1) it is highly implausible that Defendants "found" the 941 Forms on the night before the last day of trial, (2) there is no evidence that the 941 Forms were ever filed with the IRS, and (3) problems would arise if the 941 Forms did not match the state and federal tax returns.  The bankruptcy court weighed these considerations at trial.  Doc. 15-4, at 381-84.

program," noting that "Human Dynamics Corporation and Seibels Bruce Group have agreed to establish a Workers' Compensation program with policies issued by Seibels Bruce Group Companies." CV11, Doc. 11, at 41-42. The LPTA was made by "Infinet Holdings, Inc. including each of its subsidiaries" and "DAKA International Ltd." CV11, Doc. 11, at 85. Neither the interim agreement nor the loss portfolio transfer agreement establishes that HDCFS, not HDC, generated most of Infinet's revenue in 2002.

Defendants have not shown that the bankruptcy court committed clear error by finding that the money transferred from Lansdowne to HDCM belonged to HDC. The funds were correctly considered a part of the bankruptcy estate.

**B.    Workers' Compensation Claims.**

The second main defense presented before the bankruptcy court was the assertion that the funds taken by Doug Anderton through HDCM were used to pay and administer workers' compensation claims. CV11, Doc. 15-1, at 14. Judge Baum found that this defense was not credible and not supported by any credible documentary evidence. Judge Baum instead found that the evidence indicated Doug Anderton caused most of the funds to be transferred to Costa Rica and that "a not insignificant portion of the funds appeared to have been used to pay someone's personal, daily expenses." *Id.*

Defendants claim that all transfers of money resulted in the administration and payment of claims, that "movement of funds was for the benefit of Infinet and its subsidiaries and was not an improper transfer to an insider," and that HDC "received a major benefit" from the transactions. CV11, Doc. 9, at 11-12. Defendants repeat these assertions throughout their brief (*see* CV11, Doc. 9, at 14, 19), but offer sparse citations to the record in support. Of the citations that the Court could identify in the brief, Defendants point generally to an excerpt of Doug Anderton's trial testimony (CV11, Doc. 9, at 8 (citing CV11, Doc. 12, at 107)), and to ledgers from HDCM's Wells Fargo bank account (CV11, Doc. 9, at 9 (citing CV11, Doc. 11, at 108-261)). On their face, these records do not establish that the money was transferred to pay off outstanding claims, nor do Defendants offer more specific citations or further explanation.

Defendants cite Doug Anderton's testimony on cross examination that the money transferred to HDCM "was used to close the claims" (CV11, Doc. 12, at 152-53), but this vague assertion is insufficient to show that the bankruptcy court committed clear error.

In addition, Defendants argue that Riesgo, an entity that administered claims to Infinet clients from 2001 to 2003, received money from HDCM and used it to pay workers' compensation claims. CV11, Doc. 16, at 11. While Judge Baum did find that Doug Anderton transferred $914,277.36 from HDCM to Riesgo and that these funds were used for the administration and payment of workers' compensation claims (CV11, Doc. 15-1, at 19), this transfer constitutes only a fraction of the total amount of money at issue. Defendants argue that Dan Cheldin, a consultant for DAKA who managed claims under the LPTA, testified that his activities involved the administration and payment of Infinet's workers' compensation claims. CV11, Doc. 16, at 11. At trial, however, Mr. Cheldin testified that he did not know whether DAKA, Crown, or Vencap (the parties that Defendants contend administered claims pursuant to the LPTA) actually administered and paid the claims. CV11, Doc. 15-4, at 195 ("Q: And prior to 2005, Mr. Cheldin, did you ever see any bank statements from the Banco de Costa Rica related to DAKA, Crown, or Vencap?" A: No."). Mr. Cheldin testified that he had not heard of HDCM prior to his deposition in June of 2010 (*id.*), and was unable to identify any specific claims in the LPTA that were paid by DAKA (*id.* at 191-92). Defendants argue that RHDC offered no evidence at trial to show that there were any unsatisfied workers' compensation claims. CV11, Doc. 16, at 11. David Reaves, initially the chapter 11 trustee of HDC and later the president of RHDC, testified that he had examined HDC's schedules and statements, and that "50 or so" workers' compensation claims remained outstanding. Doc. 15-3, at 142. Defendants claim that both Dan Cheldin and Alex Campos, a friend of Doug Anderton's and the owner of PC General Agency, Inc. ("PCGA"), testified that all but 70 of the 1,200 claims transferred as a result of the LPTA were administered and paid when Vencap ceased operations, and that "the inference is that the other 1,130 claims were administered with the funds released by Lansdowne."

But even if the claims were paid, Defendants have cited no evidence to support the inference that they were paid using money transferred from Lansdowne.

Defendants have not shown that it was clear error for the bankruptcy court to discredit Doug Anderton's testimony that the money transferred to HDCM was used to pay claims.

## C.   Kyle Anderton's and PCGA's Dominion Over Funds.

Judge Baum found that Doug Anderton caused HDCM to transfer a total of $1,283,396.11 to PCGA. CV11, Doc. 15-1, at 18. PCGA later transferred $150,000 back to HDCM and retained $9,836; the balance of the funds was transferred at Doug Anderton's instruction to a bank account in Costa Rica. *Id.* The bankruptcy court also found that Doug Anderton caused HDCM to transfer a total of $1,799,283.01 to Kyle Anderton's bank account at Watermark Credit Union. *Id.* at 18-19. Kyle Anderton then transferred a total of $1,739,893.03 to the Costa Rican bank account. Kyle Anderton opened his Watermark Credit Union account on December 3, 2003, the transfers described took place between December 10, 2003 and February 20, 2004, and Kyle Anderton closed his account on April 7, 2004. He does not know why he received the transfers and did not provide any services to HDC in exchange for the transfers. *Id.* at 19. Judge Baum concluded as a matter of law that Kyle Anderton and PCGA were either immediate or mediate transferees of the fraudulently transferred funds of HDC, and that they took and had "dominion and control" over the HDC funds that were transferred to their accounts.[5] CV11, Doc. 15-1, at 22-23.

Pursuant to 11 U.S.C. § 544, a trustee may avoid any transfer of property of the

---

[5] The Ninth Circuit distinguishes between the "dominion test" and the "control test." Although the dominion test is sometimes stated as an inquiry into who had legal "control" over funds, the two standards differ. *In re Incomnet, Inc.*, 463 F.3d 1064, 1069 (9th Cir. 2006). The Ninth Circuit has applied the dominion test several times, but has declined to adopt the control test. *See, e.g., In re Cohen*, 300 F.3d 1097, 1102 n.2 (9th Cir. 2002); *In re Bullion Reserve*, 922 F.2d 544, 548-49 (9th Cir. 1991). The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit; the control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question. *Incomnet*, 463 F.3d at 1071 (citations omitted).

debtor, or any obligation incurred by the debtor, that is avoidable by judgment and execution creditors, as well as general unsecured creditors, under applicable law.   11 U.S.C. § 544(b)(1); *see* Doc. 15-1, at 172, ¶ 223.   The parties do not dispute that a fraudulent transfer occurred within the meaning of § 544.   If a transfer is voidable under § 544, the debtor's trustee may recover from either "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."   11 U.S.C. § 550(a)(1), (2).   A trustee's right to recover differs dramatically depending on which section applies.   *In re Cohen*, 300 F.3d 1097, 1102 (9th Cir. 2002).   The trustee's right to recover from an initial transferee is absolute, but the trustee may recover from subsequent transferees only if they did not accept the transfer for value, in good faith, and without knowledge of the transfer's voidability.   *Id.*   The good faith exception is only available to subsequent transferees.   *Id.*

Here, it is undisputed that Doug Anderton caused the transfer of funds from HDCM to Kyle Anderton's and PCGA's accounts.   Neither Kyle Anderton nor PCGA were initial transferees.   "A subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer."   *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 548 (9th Cir. 1991).   Because Kyle Anderton and PCGA were not initial transferees or entities for whose benefit the transfers were made, they were at most subsequent transferees, and their liability must be analyzed under § 550(a)(2).

"[I]t is generally accepted that a transferee is one who, at a minimum, has 'dominion over the money or other asset, the right to put the money to one's own purposes.'"   *In re Cohen*, 300 F.3d at 1102 (quoting *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).   "Dominion is therefore akin to legal control (e.g., the right to invest the funds as one chooses), not mere possession."   *Id.*

Defendants assert that "[t]here was no wrongful dominion and control over personal property."   CV11, Doc. 9, at 13.   They argue that Doug Anderton retained

- 14 -

dominion and control over the disbursement of funds from HDCM by not granting Kyle Anderton or PCGA the authority to disburse funds without his approval.  *Id.*  As support, Defendants cite testimony by Kyle Anderton and Alex Campos.  CV11, Doc. 16, at 11; *see* CV11, Doc. 13, at 29 (Kyle Anderton's testimony on cross examination) ("Q:  Did you have authority to spend the money in that account on your own decision?  A: No."); *id.* at 31 ("Q: Did you receive any authority or instructions to do anything else with that money other than make those transfers?  A: No.");  *id* at 32 (Alex Campos's testimony on direct examination) ("Q: While you had the money in your accounts, were you provided with any authority to disperse the money?  A: No.").  RHDC argues that this testimony "was a transparent attempt" to defeat the dominion and control test for establishing liability under Ninth Circuit law.  CV11, Doc. 14, at 18.  RHDC notes that Defendants have never produced any contracts outlining either Kyle Anderton's or PCGA's rights and duties with respect to the money transferred into and out of their accounts.  *Id.*

The parties' August 3, 2010 joint pretrial statement indicates that Doug Anderton caused HDCM to transfer money to Kyle Anderton's and PCGA's bank accounts held under their name.  CV11, Doc. 15-2, at 28, ¶¶ 73-81; *id.* at 29-31, ¶¶ 93-117.  Kyle Anderton and PCGA then transferred portions of this money to an account at the Banco Nacional de Costa Rica.  *See id.*  While these subsequent transfers may have been "made at [Doug] Anderton's instruction" (*id.* at 28, ¶ 77), Kyle Anderton and PCGA had legal control over the money, with no restrictions preventing them from disposing of the money as they saw fit, while it was in their accounts.  *Cf. In re Bullion Reserve*, 922 F.2d at 549 ("In *Bonded*, the bank was contractually obligated to follow the customer's instruction to deposit the funds into his account. . . . Similarly, even though the funds transferred from Saxon to Kopelson were used partially to purchase stock in Miller's name, Miller was under a contractual duty to pledge the stock immediately to Saxon.") (citation omitted).  The Court concludes that Kyle Anderton and PCGA had dominion over the funds, and were transferees subject to liability under § 550(a).

Section 550(b)(1) provides a safe harbor defense to immediate or mediate

transferees who act in good faith. *In re AVI, Inc.*, 389 B.R. 721, 736 (9th Cir. B.A.P. 2008) (citing *In re Video Depot, Ltd.*, 127 F.3d 1195, 1199 (9th Cir. 1997)). The elements of the good faith defense are (1) good faith, (2) for value, and (3) without knowledge of the voidability of the transfer. *Id.* The subsequent transferee bears the burden of proving this defense. *Id.* The Ninth Circuit has observed that there is no precise definition of good faith, but that courts look to what the transferee objectively "knew or should have known" rather than examining what the transferee knew from a subjective standpoint. *Id.* (quoting *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 536 (9th Cir. 1990)). "Transferees also have a duty to investigate if there is sufficient information to put the transferee on notice that something is wrong." *In re AVI, Inc.*, 389 B.R. at 736 (citation omitted).

Defendants submit that Kyle Anderton was asked by Mr. Cheldin, "who Kyle had known for twenty years, to take steps, including the receipt of funds, to establish an entity in the State of Washington for the administration and payment of [c]laims pursuant to the LPTA. This request was consistent with Kyle's knowledge of the business activities of the parties." CV11, Doc. 9, at 14. Defendants also submit that PCGA was asked by Doug Anderton "to begin the process of establishing a claims administration entity in Georgia," and that "[t]his request was consistent with PCGA's knowledge of the business activities of the parties and the practices of the claims administration industry." *Id.* at 15. Defendants cite no evidence to support these assertions. Even assuming that Kyle Anderton and PCGA were asked to establish entities in Washington and Georgia to administer claims, the parties have stipulated to the fact that both Kyle Anderton and PCGA wired funds to a bank account in Costa Rica. This should have put both parties on notice that something was wrong.

In addition, RHDC argues that the magnitude and timing of the transfers in and out of Kyle Anderton's and PCGA's accounts should have been enough to put them on notice. CV11, Doc. 14, at 19. The transactions happened rapidly, with the transfers out of their accounts occurring just days after the funds were deposited. CV11, Doc. 15-5,

at 174-188.  Kyle Anderton also testified that this was the first time that someone other than his wife or children has asked him to open a bank account, and that he had never before transferred such a large amount of money – approximately $1.8 million – in the span of about five months.  CV11, Doc. 15-4, at 169.  Finally, the parties have stipulated that neither PCGA nor Kyle Anderton provided any services in exchange for the money they received from HDCM, other than holding the money in their accounts for a short period of time.  CV11, Doc. 15-2, at 28, ¶ 75; *id.* at 31, ¶ 116.

The Court concludes that Kyle Anderton and PCGA had dominion over the funds transferred to them, and that they have not met their burden of establishing a good faith defense.  They are properly held liable as immediate or mediate transferees under § 550(a)(2).

### D.    HDCM's Corporate Form.

Judge Baum found that Doug Anderton created HDCM solely for the purpose of obtaining and transferring HDC's funds at Lansdowne, and that HDCM did not conduct any meaningful business.  CV11, Doc. 15-1, at 22.  Because Doug Anderton treated the HDC funds transferred from Lansdowne to HDCM as his own, Judge Baum concluded that observing the corporate form of HDCM would sanction a fraud and/or promote injustice.  *Id.*

Defendants argue that HDCM was not a sham corporation, but was formed for the express purpose of receiving the funds released by Lansdowne and ensuring that the funds were used to administer and pay workers' compensation claims.  CV11, Doc. 9, at 14, 18, 19; CV11, Doc. 16, at 12, 16.  The only citation to the record that the Court could locate in Defendants' briefing on this issue relates to their argument that HDCM's activities, as noted by Judge Baum in his findings of fact, constituted "conducting business."  CV11, Doc. 9, at 17 (citing Tab 37, ¶ 37).[6]  Judge Baum found that Doug Anderton caused HDCM to make transfers of funds to Kyle Anderton's Watermark

---

[6] While Defendants cite to tab numbers, their appendix is not actually tabbed.  In the future, counsel for Defendants is encouraged to cite specific page numbers.

Credit Union bank account and to PCGA's account at United Americas Bank.  CV11, Doc. 13, at 69-70.  Defendants cite nothing else in the record to support their position that HDCM's corporate form should not be disregarded.

Mr. Reaves testified at trial that he met with Doug Anderton shortly after his appointment as bankruptcy trustee, on approximately January 3, 2007.  CV11, Doc. 15-3, at 143.  At that meeting, Doug Anderton explained that money held by Lansdowne was transferred back into the United States into HDCM.  *Id.* at 145.  When Mr. Reaves asked Doug Anderton why he put the money in HDCM, Doug Anderton "said that, if the money had come back into the debtor's (HDC's) bank accounts, the fear was that Seibels-Bruce would try to attach it."  *Id.*

In light of this evidence, the Court affirms the bankruptcy court's conclusion that HDCM did not conduct any meaningful business and that Doug Anderton treated the funds transferred to HDCM as his own.  The Court sees no justification for observing HDCM's corporate form.

### E.    Doug Anderton's Fiduciary Duty.

Judge Baum concluded that Doug Anderton had violated his fiduciary duty to HDC and its creditors when he fraudulently caused the transfers of HDC's funds to HDCM and when he further transferred those funds to others.  CV11, Doc. 15-1, at 22.  These transfers were not for the benefit of, but to the detriment of HDC and its creditors.  *Id.*

Defendants claim that Doug Anderton "was fulfilling his fiduciary duty to Infinet and its subsidiaries, including HDC, when he took steps to ensure that the money in the Lansdowne captive was used for the administration and payment of [c]laims."  CV11, Doc. 9, at 11.  They argue that all of the transfers were dictated by the circumstances surrounding Infinet's closing down of its business operations, and that all transfers were made for the purpose of administering and paying claims.  *Id.* at 20.

It is undisputed that Doug Anderton, as president of HDC, owed a fiduciary duty to HDC and not just to Infinet.  CV11, Doc. 15-2, at 22, ¶ 8.  As discussed, Defendants'

1    attempt to distinguish the money at issue as Infinet's money, rather than HDC's money,

2    and Defendants' argument that the money was used to pay off workers' compensation

3    claims, are unsupported by the evidence in the record.  Defendants' assertion that Doug

4    Anderton fulfilled his fiduciary duty fails for the same reasons set forth above.

5    **V.    Conclusion.**

6           The bankruptcy court did not commit reversible error by ordering an extension for

7    Defendants' notice of appeal and denying RHDC's motion to vacate that order.  Having

8    reviewed the evidence on the record in the light most favorable to the prevailing party,

9    RHDC, the Court concludes that the bankruptcy court did not err by finding that the

10   money at issue belonged to HDC and was properly a part of the bankruptcy estate, that

11   the money was not used to pay workers' compensation claims, that Kyle Anderton and

12   PCGA were liable as transferees, that HDCM's corporate form should be disregarded,

13   and that Doug Anderton breached his fiduciary duty to RHDC.  The Court will affirm the

14   bankruptcy court's decision.

15          **IT IS ORDERED:**

16          1.     Reorganized Human Dynamics Corporation's appeal (CV12-00509,

17   Doc. 7) is **denied**.

18          2.     Human Dynamics Captive Management, G. Douglas Anderton, Kathy

19   Anderton, Edward Kyle Anderton, Lori J. Anderton, and PC General Agency, Inc.'s

20   appeal (CV11-02510, Doc. 9) is **denied**.

21          3.     The decision below is **affirmed**.

22          4.     The Clerk shall terminate this action.

23          Dated this 5th day of September, 2012.

24

25

26

27          _____
                   David G. Campbell
                   United States District Judge

28

- 19 -